Filed 6/13/25

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re Jayden A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E084114 |
| Plaintiff and Respondent, | (Super.Ct.No. J300064) |
| v. | OPINION |
| A.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Reversed with directions.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Helena Rho, Deputy County Counsel for Plaintiff and Respondent.

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

1

Alex T. (Father) appeals from the juvenile court's dispositional orders regarding his son, Jayden A. Father challenges the sufficiency of the evidence supporting the court's jurisdictional findings against him and the dispositional orders. We agree that the challenged findings and orders are not supported by substantial evidence, and we accordingly remand for further proceedings.

San Bernardino County Children and Family Services (CFS) argues that because Jayden's mother does not appeal from the jurisdictional findings against her, Father's substantial evidence challenge to the jurisdictional findings against him is moot even though those findings were the basis for the removal of Jayden from Father's custody at disposition. CFS also argues that because Jayden's mother did not appeal, our review of the sufficiency of the evidence to support the jurisdictional findings against Father is merely discretionary, not mandatory. In the published portion of this opinion, we reject CFS's arguments because they are contrary to Supreme Court precedent. (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*).)

We likewise reject CFS's argument that Father forfeited his challenge to the removal order and thereby eliminated any basis for reviewing the jurisdictional findings against him. Father's argument against the removal order is that the required findings were not supported by substantial evidence. Substantial evidence challenges are not forfeited by failure to raise them in the juvenile court. (*In re R.V.* (2012) 208 Cal.App.4th 837, 848 (*R.V.*); *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 (*Javier G.*).) Moreover, Father argued at the jurisdiction hearing that all of the allegations

2

against him should be dismissed. The court found against him, and the removal of Jayden from Father's custody at disposition was based on those adverse jurisdictional findings. Father was not required to assert again, at disposition, that the jurisdictional allegations were unsupported in order to preserve the issue for appellate review.

Finally, CFS recently moved to dismiss Father's appeal, because the juvenile court returned Jayden to Father's custody and terminated jurisdiction at the 12-month review hearing. We agree with CFS that the court's recent custody order renders Father's appeal moot, but we exercise our discretion to review the merits of the appeal. (*D.P.*, *supra*, 14 Cal.5th at p. 282 ["Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute"].)

BACKGROUND

I.    *Detention*

In February 2024, CFS received a referral regarding Father's 21-month-old son, Jayden. Jayden resided with J.A. (Mother), who is not a party to this appeal. The maternal great-aunt also lived in the household. There had been a domestic violence incident between Mother and her partner, Damon W., and Mother was arrested. That was her second arrest; Mother was also arrested in December 2023 for a domestic violence incident. Damon did not live in the home but visited frequently, and Mother was seven months pregnant with their child. According to the maternal great-aunt, she and Jayden were asleep in their rooms when she heard loud banging. Jayden did not observe the incident between Mother and Damon, and the child did not have any injuries from the

3

incident.  The record does not contain any other details about the incident between Mother and Damon.

The paternal grandmother reported that she had been caring for Jayden "off and on for several months" and that she was pursuing a legal guardianship with the parents' consent.  When the paternal grandmother was caring for Jayden, Father was present and would spend time with the child.  But the paternal grandmother believed that Father "was not in a position to care for Jayden on his own."  She said that Father "'has an explosive disorder' and can get frustrated while parenting."  She wanted CFS to place Jayden with her, but she was not approved for emergency placement after a background check.  The social worker advised her that she could still be considered for placement through a 30-day process.

CFS was unable to interview Mother because she was in custody.  The social worker asked Father about Jayden's care, and Father explained that he was renting a room from a relative and was not in a position to care for Jayden at that time.  The worker also asked whether Father had "any mental health issues that could impact his parenting ability," and Father stated, "'I know how to parent my kid.'"  He reported that he had attention deficit hyperactivity disorder (ADHD) and that it was "under control" with individual counseling.  He was upset that CFS was unable to place Jayden with the paternal grandmother, and he confirmed that she was pursuing a legal guardianship and that he consented to that plan.

4

The paternal uncle was approved for emergency placement, and CFS placed Jayden with him. CFS filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1) (§ 300(b)(1)) alleging that (1) Mother was the aggressor in recent domestic violence incidents in the home, placing Jayden at substantial risk of physical harm, and (2) Father knew or reasonably should have known that Jayden was at risk of harm because he knew about Mother's domestic violence issues but failed to take steps to protect the child. (Unlabeled statutory citations refer to the Welfare and Institutions Code.) The court detained Jayden from both parents, ordered CFS to provide predisposition services, and ordered supervised visitation once per week for two hours.[1]

II.    *Jurisdiction and disposition*

When interviewed for the jurisdiction/disposition report, Father stated that he was in an "off and on" relationship with Mother for four years, which ended shortly after Jayden's first birthday. He said that he and Mother had a history of domestic violence

---

[1]    We note that it is not clear that Jayden should have been detained from Father. When first contacted, Father said that he could not then provide care for Jayden himself because his residence was inadequate, but he expressed frustration that CFS would not place Jayden with the paternal grandmother. The paternal grandmother had already been providing care for Jayden "off and on for several months," apparently without incident, and she was pursuing a legal guardianship with the parents' consent. The record contains no indication that either the social worker or the court at the detention hearing gave Father the opportunity to make appropriate arrangements for Jayden's care by having Jayden reside with the paternal grandmother. CFS reported that a background check ruled out the paternal grandmother as an emergency placement (see § 361.4), but the statutory requirements for an emergency placement *by CFS* do not apply to Father (cf. *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1320-1321). "The standards applied to the government's decision to remove a child from his or her parent's home and to place the child in a foster home, even temporarily, are understandably different and more rigorous than those used to evaluate a parent's own plan for his or her child." (*Id.* at p. 1333.)

but that Mother was the perpetrator. He reported that she had anger management issues. Father lived with the paternal great-aunt in California City, California, and he was temporarily staying with the paternal grandmother in Colton, California. He was unemployed and received supplemental security income (SSI) benefits because of his ADHD diagnosis. He reported that he also had impulse-control disorder and obsessive-compulsive disorder. Father said that he last smoked marijuana roughly one month ago and that he did not have a drug addiction.

Father last saw Jayden roughly one week before CFS removed him from Mother's home. He and Mother had an informal arrangement in which he had unsupervised visitation with Jayden. He stated that he loved Jayden and was willing to do whatever was necessary to reunify with his son. Father did not know why someone reported that "he has explosive and angry outbursts" or that he loses his patience with Jayden, but that was untrue. He had strong support from his family, and they were willing to help him with childcare if Jayden were placed in his home. CFS identified the paternal grandmother, the paternal great-aunt, and the paternal uncle as part of the family's primary support system. Jayden appeared to be healthy, happy, and developmentally on track.

Mother admitted that she had issues with anger management, but she reported that she was the victim of domestic violence perpetrated by Damon. She had two criminal cases for domestic violence and was on probation.

CFS's report requested a continuance of the jurisdiction and disposition hearings to assess whether Jayden should be placed with Father and whether to recommend dismissal with a juvenile custody order. At the hearing in March 2024, CFS indicated that return to Father was "probably off the table at this point." Father told the court that he planned on moving into the paternal grandmother's home if Jayden were placed with him. Father apparently was visibly shaking, because the court asked him why he was "shaking so much," and Father replied that he had ADHD and was anxious. The court asked Father whether he took medication for ADHD, and Father responded: "I was doing marijuana, but I haven't done it in over a month." He also said that he stopped taking medication "because it made it worse." The court continued the jurisdiction and disposition hearings and ordered Father to drug test.

In preparation for the continued hearings, CFS reported on an earlier referral that it had closed as inconclusive. CFS received the referral in September 2023 alleging general neglect by both parents, and the agency closed the referral as inconclusive in February 2024, four days before the referral in this case. The social worker conducting that earlier investigation interviewed the paternal grandmother in January 2024. The paternal grandmother stated that Father was not capable of providing long-term care for Jayden because of Father's "'temperamental' nature." She also stated that Father "'has a low threshold for how many of Jayden's "behaviors" he can tolerate [for] any given length of time.'" The report continued: "'When [Father] reaches his limit and becomes overwhelmed by Jayden, he will excuse himself and effectively distance himself, often

7

for a few days. [Father] always returns to Jayden after distancing himself, but [the paternal grandmother] does not regard [Father] as a stable, long-term option for Jayden's care because he cannot care for Jayden continuously without having to take a break from parenting.'"

CFS also reported on recent text messages that Father sent to the social worker in April 2024. Father told the social worker that he had not seen Mother in many of the parenting classes and said: "'I am focused on myself I just don't want to hear more bullshit when I have to go to court again about how she is supposably doing the shit to get our kid back when the broad hasn't done shit . . . .' 'I just don't want to hear no bullshit ass lie again about how she is doing the same shit as me and no one fact check her and just goes along with her fairy tails and lies.'" (All grammatical and other errors are in the original.) He also sent the social worker text messages asking to speak to her supervisor, because he felt that she was discriminating against him as "'a man trying to get his son back.'" He claimed that he had spoken to the fathers in some of her other cases, and they all told him that she was discriminating against them, so he wanted a new social worker assigned to his case.

Mother reported that Father initiated the domestic violence incidents between them, although she defended herself when they occurred. She described Father as the aggressor during their relationship.

Father's visits with Jayden were going well. In March and April 2024, Father tested positive for marijuana three times and missed one drug test. From April to June

8

2024, he tested negative three times and missed one test.  Father completed parenting classes and individual therapy.  He had also started anger management and domestic violence classes.  In June 2024, the social worker reported that Father had "been much more respectful when having contact with CFS."

CFS filed an amended petition adding allegations that (1) Father uses substances, impacting his ability to provide adequate care and supervision for Jayden, (2) Father has mental health issues, impacting his ability to provide adequate care and supervision for Jayden, and (3) Father has a history of engaging in domestic violence, placing Jayden at risk of serious physical harm.  The amended petition contained other allegations as to Mother.  CFS recommended that the court remove Jayden from both parents and order reunification services for them.

The continued jurisdiction and disposition hearings occurred in June 2024.  Father argued that the jurisdictional allegations against him were not supported by evidence and asked the court to dismiss the allegations.  Counsel then stated:  "Otherwise, we are submitting on reunification services.  Father is engaged in his services at this time."

The court found true all four of the allegations regarding Father and two allegations regarding Mother.  It dismissed a remaining allegation regarding Mother.  The court declared Jayden a dependent of the court and removed him from both parents' custody.  The court found that there would be a substantial danger to Jayden's physical health, safety, protection, or physical or emotional well-being if Father were to live with the child or otherwise exercise his right to physical custody, and that there were no

9

reasonable means to protect Jayden's physical and emotional health absent removal. The court also found that placement with Father would be detrimental to Jayden's safety, protection, or physical or emotional well-being. The court ordered reunification services for both parents. Father timely appealed from the dispositional orders.

CFS recently moved to augment the record with materials relating to the 12-month review hearing, which occurred in April 2025.[2] According to CFS's report for the 12-month review hearing, Father had successfully completed his case plan, and Jayden began a 29-day visit with Father in February 2025. Jayden was placed in Father's home in March 2025, and Father was receiving family maintenance services. Father and Jayden were living with the paternal grandmother.

At the 12-month review hearing, the court terminated Mother's reunification services, ordered that Father have physical and legal custody of Jayden, and ordered supervised visitation for Mother. The court then terminated jurisdiction.

DISCUSSION

I.      *CFS's motion to dismiss, mootness, and related forfeiture issue*

In the respondent's brief, CFS argues that Father's challenge to the jurisdictional findings is moot and therefore nonjusticiable, because the jurisdictional findings against Mother are unchallenged. In addition, CFS moved to dismiss the appeal after we issued our tentative opinion. The motion argues that because the juvenile court returned Jayden to Father's custody and terminated jurisdiction at the 12-month review hearing, the

---

[2]      We grant the motion to augment. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

10

appeal is moot. We disagree that the jurisdictional findings regarding Mother render Father's jurisdictional challenge moot, but we agree that the orders returning Jayden to Father's custody and terminating jurisdiction render this appeal moot. We nevertheless exercise our discretion to review the merits of Father's challenge, and we accordingly deny CFS's motion to dismiss.

A.      *Legal principles*

Courts are tasked with deciding actual controversies by a judgment that can be carried into effect. (*D.P.*, *supra*, 14 Cal.5th at p. 276.) Generally, it is not our duty to render opinions on moot questions or abstract propositions. (*Ibid.*) But "a case is not moot where a court can provide the plaintiff with 'effect[ive] relief.' [Citation.] In this context, relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.'" (*Id.* at p. 277.)

In dependency cases, if "jurisdictional findings have been made as to both parents but only one parent brings a challenge," then "the appeal may be rendered moot." (*D.P.*, *supra*, 14 Cal.5th at p. 283.) That is because "[d]ependency jurisdiction attaches to a child, not to his or her parent." (*In re D.M.* (2015) 242 Cal.App.4th 634, 638.) As long as there is at least one unchallenged jurisdictional finding, the reviewing court may affirm the juvenile court's finding of jurisdiction over the child, regardless of whether other findings are supported by substantial evidence. (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

11

But according to our high court in *D.P.*, such an appeal is not moot if the challenged jurisdictional finding "'serves as the basis for dispositional orders that are also challenged on appeal.'" (*D.P.*, *supra*, 14 Cal.5th at p. 283.) "Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*Id.* at p. 277.) There is "a specific legal or practical consequence that will be averted upon reversal." (*Id.* at p. 283; accord, *In re S.F.* (2023) 91 Cal.App.5th 696, 712 [unchallenged jurisdictional findings as to the mother did not moot the father's jurisdictional challenge, because the father also challenged dispositional orders on appeal].)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P.*, *supra*, 14 Cal.5th at p. 282.) "[T]he availability of such discretion is particularly important in the dependency context, as several features common to dependency proceedings tend to render parents' appeals moot." (*Id.* at p. 283.) For instance, "the speed with which dependency cases are resolved will often render appeals moot. A key feature of juvenile court is expeditious resolution of pending cases." (*Id.* at p. 284.) And juvenile courts must conduct periodic review hearings that involve ongoing evaluations of the parents' willingness and ability to provide appropriate care for their children. (*Ibid.*) The juvenile courts receive continuously updated information "and may alter orders in response to changing facts." (*Ibid.*) Appellate review of a particular order "proceeds more slowly" and "may often take up to 18

12

months." (*Ibid.*) Parents thus may be appealing an order that the juvenile court later changed. (*Id.* at p. 285.)

Dismissal of an appeal for mootness may have the undesirable effect of insulating errors from review, so appellate courts "have understandably opted to exercise their inherent discretion to decide certain challenges" that are otherwise moot. (*D.P.*, *supra*, 14 Cal.5th at p. 285.) In deciding whether to exercise that discretion, courts consider a variety of factors (*ibid.*), including "why the appeal became moot" (*id.* at p. 286). When "the case becomes moot due to prompt compliance by parents with their case plan, discretionary review may be especially appropriate." (*Ibid.*) No mootness concern would arise if the parents did not complete their case plan in a timely manner, and the juvenile court consequently continued its jurisdiction during an appeal. (*Ibid.*) The mootness doctrine "would perversely incentivize noncompliance" if it resulted in the availability of appeals only for parents who are less compliant with their case plans. (*Ibid.*) "Principles of fairness may thus favor discretionary review of cases rendered moot by the prompt compliance or otherwise laudable behavior of the parent challenging the jurisdictional finding on appeal." (*Ibid*.)

*D.P.* set forth several other factors that appellate courts may consider in deciding whether to reach the merits of a moot appeal.[3] (*D.P.*, *supra*, 14 Cal.5th at pp. 285-286.)

---

[3]  Those factors include (1) "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or '"could have other consequences for [the appellant], beyond jurisdiction"'"; (2) "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct"; and (3) whether the challenged finding is based on "more serious conduct" than unchallenged findings. (*D.P.*, *supra*, 14 Cal.5th at pp. 285-286.)

The court also clarified that those factors "are not exhaustive, and no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal. Ultimately, in deciding whether to exercise its discretion, a court should be guided by the overarching goals of the dependency system: 'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.' [Citations.] . . . A reviewing court must decide on a case-by-case basis whether it is appropriate to exercise discretionary review to reach the merits of a moot appeal, keeping in mind the broad principles and nonexhaustive factors discussed" in *D.P.* (*Id.* at pp. 286-287.)

B. *CFS's argument based on the unchallenged jurisdictional findings*

Although the jurisdictional findings regarding Mother are not challenged, that circumstance does not moot Father's jurisdictional challenge. He also challenges the juvenile court's dispositional order removing Jayden from his custody, arguing that it is "based on erroneous jurisdictional findings." (Boldface and capitalization omitted.) That is precisely the circumstance in which our high court has concluded that an appeal challenging jurisdictional findings against only one parent is not moot. (*D.P.*, *supra*, 14 Cal.5th at p. 283.)

CFS's arguments to the contrary lack merit. The respondent's brief acknowledges that Father is also challenging the dispositional order. But CFS asserts that the dispositional challenge is merely a circumstance that courts may consider when deciding whether to exercise their discretion to reach the merits of a moot appeal. *D.P.*

14

rejected the argument that the dispositional challenge supports only discretionary review of a moot appeal. Our high court noted that *In re Drake M.* (2012) 211 Cal.App.4th 754 "found discretionary review to be appropriate 'when the [jurisdictional] finding . . . serves as the basis for dispositional orders that are also challenged on appeal.'" (*D.P.*, *supra*, 14 Cal.5th at pp. 282-283, quoting *Drake M.*, at p. 762.) *D.P.* explained that *Drake M.* was wrong on that point: The "appeal is not moot" in those circumstances, so there is no discretion to forgo review. (*D.P.*, at p. 283.) Rather, "merits review is required." (*Ibid.*) And the court expressly disapproved *Drake M.* to the extent that it suggests the additional challenge to the dispositional order "is insufficient to avoid mootness and supports only discretionary review." (*D.P.*, at p. 283.) The respondent's brief cites *Drake M.* in its discussion of discretionary review but fails to note that the case has been disapproved, and the brief does not cite *D.P.* at all.

CFS's second argument fares no better. The agency argues that review based on the challenge to the dispositional order is not appropriate, because Father forfeited his right to challenge the order, and he does not identify any other specific harm that would be averted upon reversal of the jurisdictional findings. CFS reasons that Father forfeited his challenge when counsel "submitt[ed] on reunification services" at the disposition hearing. In addition, the agency contends that Father failed to object to the juvenile court's finding that it would be detrimental to place Jayden with Father.

Father has not forfeited his challenge to the dispositional order removing Jayden from his custody. First, the case law on which CFS relies held that a parent forfeited her

15

challenge to removal by submitting on the social worker's recommendation to remove the children. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 587-591.) But Father did not say that he was submitting on the social worker's recommendation (which included removal), nor did he say that he was submitting on removal. He stated that he was submitting on reunification services specifically.

Second, Father's submission may have meant only that if the court found against Father on the jurisdictional allegations, then he would have no *additional* arguments to present at disposition in light of the court's adverse factual findings at jurisdiction. In order to preserve his objection to removal, Father was not required to assert at disposition, "The court's factual findings at jurisdiction were wrong, so Jayden should not be removed from my custody." In addition to trying the court's patience, such an argument would have been improper—the disposition hearing is not an appropriate proceeding in which to challenge the jurisdictional findings.

Third, given Father's argument that the jurisdictional allegations against him were unsupported, CFS's claim that he did not object to removal based on the same record is illogical. We decline to attribute such an incoherent position to Father, particularly in the absence of a clear statement that he was submitting on removal. Instead, a reasonable interpretation of Father's counsel's statement that he "submitt[ed] on reunification services" would be that (1) if the court disagreed with him and found the jurisdictional allegations true by a preponderance of the evidence, and (2) if the court further found the

16

evidence sufficient to remove Jayden under the higher clear and convincing evidence standard, then (3) Father agreed that he should receive reunification services.

CFS's argument that Father forfeited his dispositional challenge by failing to object to the juvenile court's detriment finding also is meritless. Father challenges the sufficiency of the evidence supporting the court's order. Substantial evidence challenges are not forfeited by failure to raise them in the juvenile court. (*R.V.*, *supra*, 208 Cal.App.4th 837, 848; *Javier G.*, *supra*, 137 Cal.App.4th 453, 464.) A "parent is not required to object to the agency's failure to carry its burden of proof." (*Javier G.*, at p. 464.)

For all of these reasons, we conclude that the unchallenged jurisdictional findings regarding Mother do not render Father's jurisdictional challenge moot, and Father did not forfeit his challenge to the dispositional order.

C. *CFS's argument based on the orders at the 12-month review hearing*

The court's orders returning Jayden to Father's custody and terminating jurisdiction rendered this appeal moot. "For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*D.P.*, *supra*, 14 Cal.5th at p. 276.) Father argues that the court erred by removing Jayden from his custody, but that claimed harm is no longer ongoing. "[T]he jurisdictional findings are not the basis of any *current* order that is adverse" to him, so

17

"no effective relief can be granted." (*In re N.S.* (2016) 245 Cal.App.4th 53, 61, italics added.)

Nevertheless, we exercise our discretion to review the merits of the appeal. Discretionary review is "especially appropriate" in this case. (*D.P.*, *supra*, 14 Cal.5th at p. 286.) Father promptly and successfully completed reunification services, including domestic violence classes, parenting classes, individual therapy, anger management, and random drug testing. Jayden was returned to Father's care even before the 12-month review hearing. In preparation for that hearing, CFS reported that "Jayden appears to be safe, healthy, and improving developmentally in the home" of Father, and the agency recommended that the court dismiss the case. "Principles of fairness" weigh in favor of our discretionary review, because Father's "laudable behavior" mooted the appeal. (*Ibid.*)

In sum, although Father's appeal is moot, we exercise our discretion to reach the merits of the appeal. We therefore deny CFS's motion to dismiss.

II.     *Jurisdiction*

Father argues that the record does not contain substantial evidence to support the jurisdictional findings against him. We agree.

Section 300 describes the ways in which a child may come within the dependency jurisdiction of the juvenile court. As relevant here, section 300(b)(1) provides that a child may come within the court's jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a

18

parent's failure or inability "to adequately supervise or protect the child" or the parent's inability "to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  (§ 300(b)(1)(A), (D).)

A jurisdictional finding under section 300(b)(1) requires that CFS prove by a preponderance of the evidence the following elements:  "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)  The juvenile court "'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.'"  (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)  But the child must be subject to the defined risk of harm at the time of the jurisdiction hearing.  (*In re Roger S.* (2018) 31 Cal.App.5th 572, 582.)  Although evidence of past conduct may be probative of current risk, past acts "alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur."  (*In re G.Z.* (2022) 85 Cal.App.5th 857, 877.)

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine if substantial evidence, contradicted or not, supports it.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  We draw all reasonable inferences from the evidence to support the finding and review the record in the light most favorable to the court's determination.  (*Ibid.*)  We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding.  (*Ibid.*)

Starting with the domestic violence findings, no evidence shows that Jayden was at substantial risk of serious physical harm because of Father's conduct. Both parents acknowledged that they engaged in domestic violence during their relationship, although each parent said that the other was the perpetrator. But the record contains no details about those incidents, including when they occurred. And there is no evidence that any incidents took place in Jayden's presence or that he was physically harmed or at risk of physical harm because of any incidents between the parents. Nor is there any evidence that after the parents ended their relationship, the domestic violence between them continued or was likely to continue. Father had visits with Jayden before CFS became involved, and there were no reports of incidents when the parents exchanged the child.

CFS contends that Father's text messages disparaging Mother constitute evidence of an on-going conflict between the parents. Those messages do not support a reasonable inference that Father was likely to engage in domestic violence with Mother. The messages were inappropriate, but they did not threaten violence, and Father sent those messages to the social worker, not to Mother. There is no evidence that he sent similar messages to Mother or that he had recently interacted with her in an otherwise antagonistic manner. And by the time of the jurisdiction hearing, the social worker reported that Father had been "much more respectful" in his communications. Domestic violence "may support the exercise of jurisdiction under [section 300(b)(1),] but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.*

20

(2011) 192 Cal.App.4th 713, 717, disapproved on another ground by *D.P.*, *supra*, 14 Cal.5th at p. 278.) The evidence in this case fails in both respects. There is no indication that violence between the parents was ongoing or likely to continue, and there is no evidence that such violence ever harmed Jayden physically or placed him at risk of physical harm, let alone a substantial risk. (See *In re B.H.* (2024) 103 Cal.App.5th 469, 482-483 [jurisdiction was not supported when there was one incident of past domestic violence outside the children's presence and no evidence that violence was ongoing or likely to recur between the divorced parents]; *In re S.F.*, *supra*, 91 Cal.App.5th at pp. 716-717 ["there is no substantial evidence of any 'nexus' between the parents' prior arguments, shoving, and texting, and substantial risk of serious physical injury to minor"].)

Similar reasoning applies to the finding that Father failed to protect Jayden from Mother's domestic violence with her current partner. Father said that Mother had anger management issues and that she was the perpetrator of domestic violence against him. Even if Father had reason to believe that Mother had a new partner and that she would engage in domestic violence with the new partner, there is no evidence that Mother ever did so in Jayden's presence, either with Father or with Damon. There thus is no evidence that Father had reason to believe that Mother would engage in domestic violence in Jayden's presence. Indeed, the evidence shows that Jayden was asleep in another room when the February 2024 incident between Mother and Damon occurred, and the child was not injured or put at risk of injury. The record contains no information about what

21

led to Mother's other arrest in December 2023 for domestic violence. Any inference that Jayden was at substantial risk of physical harm because of Father's failure to protect him from Mother's domestic violence was speculative. Speculation or conjecture does not constitute substantial evidence. (*In re J.A.*, *supra*, 47 Cal.App.5th at p. 1046.)

The findings regarding Father's mental health issues likewise are not supported by substantial evidence. "[C]ourts have routinely rejected the equation of mental illness with a significant risk of serious harm." (*In re N.R.* (2023) 15 Cal.5th 520, 558.) "'The law is settled that harm may not be presumed from the mere fact of a parent's mental illness.' [Citation.] There must be some connection between the parent's mental health issues and the physical harm or risk of physical harm to the child." (*In re B.H.*, *supra*, 103 Cal.App.5th at p. 485.) Father acknowledged that he had ADHD, impulse-control disorder, and obsessive-compulsive disorder. But there is no evidence that those disorders affected his ability to care for Jayden such that the child was at substantial risk of physical harm. CFS asserts that Father admitted that he was "not in a position to care for Jayden." Father made that statement in connection with the detention report, when the social worker was trying to arrange care for Jayden. Father told the worker that he was renting a room from a relative and not in a position to care for Jayden "at [that] time." He never said that he was unable to care for Jayden because of a mental health disorder. On the contrary, when the social worker asked specifically about mental health issues, Father said that he knew how to parent Jayden and that his ADHD was under

22

control with counseling. His claimed admission was not evidence that his mental illness put Jayden at substantial risk of physical harm in his care.

CFS also relies on the paternal grandmother's opinion that Father could not provide long-term care for Jayden, because Father got frustrated while parenting, became overwhelmed, and needed to "'distance himself, often for a few days.'" CFS asserts that the paternal grandmother's statements show that Jayden would be in danger in Father's care. But none of that shows that Jayden was at substantial risk of physical harm. On the contrary, it shows that Father arranged for appropriate care for Jayden when Father's mental condition made him unable to provide that care himself. There is no evidence that Father took his frustration out on Jayden. There also is no evidence that he left Jayden with an inappropriate caregiver or with someone who was unwilling to care for Jayden. Rather, the paternal grandmother wanted to care for Jayden—she was in the process of seeking a legal guardianship when this case began. CFS contends that although the paternal grandmother cared for Jayden at times, it is "unknown" whether Father is "actually capable of asking for help." The record does not support that assertion. Father reported that he had strong support from his family and that they were willing to help him care for Jayden, and CFS identified the paternal grandmother and other paternal relatives as part of his support system. Consistent with all of that, Father told the court that he planned to move into the paternal grandmother's home if Jayden were placed with him. The evidence thus shows that Father was aware that he would need help caring for Jayden, and he was able and willing to arrange for the help.

CFS further argues that Father was mismanaging his mental health, as evidenced by his failure to take medication, his marijuana use, his hostile text messages to the social worker, and his uncontrolled shaking at the initial jurisdiction hearing. CFS asserts that Father was self-treating his disorders with no apparent guidance from a medical professional. But Father reported that he was in individual counseling, and there is no evidence to the contrary. He also completed individual therapy as part of his predisposition services in this case, and there is no evidence from that therapist expressing concern about his mental health or parenting abilities. And as already explained, the social worker reported that Father had been much more respectful in his communications after the hostile messages. As for Father's shaking during his court appearance, Father stated that it was because he was anxious. Anxiety during a court appearance does not support a reasonable inference that Jayden was at substantial risk of physical harm in Father's care.

CFS contends that *In re Kristin H.* (1996) 46 Cal.App.4th 1635 is instructive, but the case is not analogous. The *Kristin H.* court concluded that substantial evidence supported the finding that the mother's mental illness and substance abuse posed a substantial risk of physical harm to her four-year-old daughter. (*Id.* at pp. 1643, 1653-1654.) The evidence in *Kristin H.* included statements from the mother's psychologist and her psychiatrist. (*Id.* at p. 1654.) The mother had been diagnosed with generalized anxiety disorder and borderline personality disorder. (*Id.* at pp. 1651-1652.) Both doctors said that the mother was in crisis and that her daughter should not be in her care.

(*Id.* at p. 1654.) The psychiatrist recommended that the mother take medication to treat her mental health disorders, but the mother refused. (*Id.* at pp. 1647-1648.) The mother had a severe anxiety attack, ingested illegal drugs (either cocaine or methamphetamine), and neglected to care for her daughter. (*Id.* at pp. 1643, 1652-1653.) On another occasion, the mother was distraught over problems with her boyfriend and overdosed on prescription drugs while her daughter was in her care. (*Id.* at pp. 1643-1644, 1654.) On a third occasion, after the mother had been upset by a friend's death, a neighbor found the child wandering outside alone while the mother slept. (*Id*. at p. 1643.) Both doctors said that the mother's drug abuse "exacerbated her condition and impaired her already poor judgment." (*Id*. at p. 1654.)

The evidence in this case is not comparable. There is no evidence that Father stopped taking medication against the advice of a medical professional. There is no evidence from a medical professional at all, let alone an opinion that Father is in crisis and should not be caring for Jayden. And there is no evidence that Father left Jayden without appropriate care or supervision. CFS failed to show a substantial risk of physical harm resulting from Father's mental health disorders.

Lastly, the finding that Father's substance use placed Jayden at substantial risk of physical harm is not supported by substantial evidence. Father admitted that he used marijuana, and he drug tested eight times during the case with mixed results (three positive tests, three negative tests, and two failures to appear). However, his "drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction." (*In re*

*L.W.*, *supra*, 32 Cal.App.5th at p. 849.) "Substance abuse, when shown to exist, should not be regarded as automatically amounting to prima facie evidence of the other facts required for dependency jurisdiction. Courts must undertake a further inquiry to ascertain whether the government has met its burden as to each of the elements involved, without shifting the burden to a parent or guardian to rebut a presumption created by a finding of substance abuse." (*In re N.R.*, *supra*, 15 Cal.5th at p. 559.) CFS did not carry its burden. The record contains no evidence that Father used marijuana while caring for Jayden or that his marijuana use ever affected his ability to care for Jayden. CFS points out that Jayden was not yet two years old, so he needed constant care and supervision, and Father had a "practice" of leaving Jayden for days at a time. There is no evidence of a nexus between Father's marijuana use and his claimed practice of leaving Jayden. (See *In re David M.* (2005) 134 Cal.App.4th 822, 829 [no evidence that the mother's use of marijuana while pregnant caused the tremors and muscle stiffness that the baby exhibited], abrogated on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 628-629.) But even if we assume that Father left Jayden in the paternal grandmother's care because of his marijuana use, the record still lacks any evidence that leaving Jayden with the paternal grandmother posed a substantial risk of physical harm to the child.

In sum, none of the jurisdictional findings as to Father is supported by substantial evidence. There is no evidence that past domestic violence between the parents, Father's mental health disorders, or his marijuana use placed Jayden at substantial risk of physical harm at the time of the jurisdiction hearing. Moreover, no evidence shows that Jayden

was at substantial risk of physical harm because of Father's failure to protect the child from domestic violence between Mother and her current partner. We therefore direct the juvenile court to vacate the jurisdictional findings against Father.

III. *Disposition*

Father argues that if the jurisdictional findings against him are not supported by substantial evidence, then we must also reverse the dispositional order removing Jayden from his custody. We agree.

Section 361, subdivision (d), governs removal of a child from a noncustodial parent. (*In re S.F.*, *supra*, 91 Cal.App.5th at pp. 718-719.) Under that provision, the court may not remove a dependent child from the physical custody of the parent "with whom the child did not reside at the time the petition was initiated" unless the court finds by clear and convincing evidence that (1) "there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody," and (2) "there are no reasonable means by which the child's physical and emotional health can be protected without removing the child" from the parent's custody. (§ 361, subd. (d).)

Like the jurisdictional findings, the court's dispositional findings and order are reviewed for substantial evidence. (*In re S.F.*, *supra*, 91 Cal.App.5th at p. 713.) But "appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands."

(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) Accordingly, "when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.)

As already explained, the court's jurisdictional findings that Father placed Jayden at substantial risk of physical harm are not supported by substantial evidence. We necessarily reach the same conclusion as to the finding that there would be a substantial danger to Jayden's physical health if Father were to exercise his right to custody: The finding is not supported by substantial evidence, "particularly taking into account the higher clear and convincing standard of proof." (*In re S.F.*, *supra*, 91 Cal.App.5th at p. 722.) Moreover, there is no evidence that Father poses a substantial danger to Jayden's emotional well-being, to the extent that the court based its removal order on any emotional harm.

Father asserts that section 361.2 governs removal of a child from a noncustodial parent, and he argues that the court's finding under that section is not supported by substantial evidence. It is incorrect that section 361.2 governs removal. That section governs *placement* of a child with one parent after removal from another parent pursuant to section 361. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820-1821.) Specifically, if the court orders removal under section 361 and the noncustodial parent requests custody of the child, then "the court shall place the child with the parent unless it finds

28

that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

Father did not expressly request custody of Jayden at the continued jurisdiction and disposition hearings. The court nevertheless made a detriment finding under section 361.2 in addition to the required removal findings under section 361, subdivision (d). Our conclusion is the same whether we consider the detriment finding under section 361.2 or the substantial danger finding under section 361, subdivision (d). That is, given the lack of evidence supporting the jurisdictional findings, the evidence is insufficient to support the finding that placement with Father would be detrimental to Jayden's physical or emotional well-being. And that conclusion is strengthened by the fact that the detriment finding, like the removal findings, must be supported by clear and convincing evidence. (*In re Marquis D.*, *supra*, 38 Cal.App.4th at p. 1827 [holding that the clear and convincing standard of proof applies to the detriment finding under § 361.2].)

For all of these reasons, we conclude that the record does not contain substantial evidence supporting the order removing Jayden from Father's custody or the detriment finding regarding placement with Father.[4]

## DISPOSITION

The juvenile court is directed to reinstate dependency jurisdiction. The dispositional findings and orders are reversed. The juvenile court is directed to (1) vacate

---

[4] Because the dispositional order removing Jayden from Father's custody is not supported by substantial evidence, the court must hold a new disposition hearing. Given the court's recent orders at the 12-month review hearing, we direct the court to terminate jurisdiction with a custody order at the new disposition hearing.

the true findings on the jurisdictional allegations against Father and dismiss those allegations, and (2) conduct a new disposition hearing, at which the court shall remove Jayden from Mother, place him with Father, order that Father have legal and physical custody of Jayden, provide for reasonable visitation by Mother, and terminate jurisdiction. (§ 361.2, subd. (b)(1).) The custody order that will be entered at the new disposition hearing shall supersede the custody order that was entered at the 12-month review.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ
J.

We concur:

MILLER
Acting P. J.

CODRINGTON
J.

30